IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 22, 2003

# STATE OF TENNESSEE v. JACKIE LEONARD DURHAM AND GARY LEE RAINES, ALIAS GARY L. RAINS

**Appeal from the Criminal Court for Hamilton County**
**Nos. 232861, 232862     Stephen M. Bevil, Judge**

**No. E2001-01509-CCA-R3-CD**
**June 24, 2003**

The defendants, Jackie Leonard Durham and Gary Lee Raines, alias Gary L. Rains, appeal as of right their convictions by a Hamilton County Criminal Court jury for second degree murder, a Class A felony. Durham received an agreed twenty-five-year sentence as a violent offender, and Raines received an agreed twenty-year sentence as a violent offender. Both defendants contend that (1) the evidence is insufficient to support their second degree murder convictions and (2) prosecutorial misconduct in closing argument requires a new trial. Additionally, Raines contends that (3) the trial court committed plain error by not instructing the jury on voluntary intoxication. We affirm the trial court's judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Mike A. Little and David R. Barrow, Chattanooga, Tennessee, for the appellants, Jackie Leonard Durham and Gary Lee Raines, alias Gary L. Rains.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William H. Cox, III, District Attorney General; and Barry Allen Steelman and Christopher Poole, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case arises out of the April 1, 2000 stabbing death of Darryl Bean in Chattanooga, Tennessee. Rick Edwards testified that he and the victim were good friends and had known each other for twenty years. He said he was also friends with the defendants, whom he had known for about five years. He said that on April 1, 2000, he and the victim drank a couple of twenty-four-ounce beers together at the flea market on East 23rd Street. He said the victim tried to sell a knife while he bought two quarts of King Cobra beer. He said he and the victim were sitting at a table at

the flea market drinking beer when the defendants along with Ray Kennimer and Mr. Kennimer's children, DeWayne and Ray, Jr., came over. He said that they shared their beer with the defendants and Mr. Kennimer and that the victim and Raines, whom he referred to as Yogi, showed each other their knives. He said that the victim and Raines laid their knives on the table and that the victim's knife had a light brown, wooden handle. He said that suddenly, the victim and Raines began arguing about their "mommas and stuff." He said he told them the argument was childish and to stop. He said that at that point, he had grabbed their knives but then gave them back.

Mr. Edwards testified that he tried to break up the argument by asking Durham to get Raines to leave while he got the victim to go. He said that Durham was standing with his hand in his pants pocket. He said that he told the victim, "let's go," and that as the victim walked past Durham, Durham stabbed the victim in the back three times with a knife and said, "Yeah, Motherf****r." He said the victim had not said anything to Durham. He said the victim ran around the table and fell. He said that Raines began kicking the victim and that Mr. Edwards told the victim to get up and run. He said that the victim got up and tried to run away but that Raines chased the victim and stuck the back of the victim's leg with a knife. He said he ran and pulled Raines off the victim, who got up, walked toward the street, and fell beside a house. He said the defendants took off their shirts and ran. Mr. Edwards denied getting into a fight with Raines that day.

On cross-examination, Mr. Edwards testified that he forgot to mention to the police or during his testimony in the general sessions court that Durham cursed after stabbing the victim. He said that the victim had two knives and that the victim's knife with the wooden handle was not opened when he grabbed it from the table. He recognized a steel knife with a hooked blade as being the victim's but denied seeing that knife in the victim's hands. He said that Mr. Kennimer tried to get his children out of the way when the victim and Raines were arguing. He agreed that Mr. Kennimer had asked them for beer, and he said that although the victim had refused, he gave Mr. Kennimer some. He also agreed that the victim made a comment about Mr. Kennimer's mother. He said that he was "not really" drunk on the day of the offenses. He admitted that the state had given him a recording of his statement that he had reviewed the week before trial.

Twelve-year-old DeWayne DeWight Kennimer testified that on the day of the victim's death, he and his younger brother were helping their father Ray Kennimer clean up at the East 23rd Street flea market. He said he saw Rick Edwards talking to the victim. He said that the defendants arrived and talked and drank beer with the victim and Mr. Edwards in one of the flea market sheds, which had a roof but no walls. He said that he was friends with Durham and also knew Raines, whom he called Yogi. He said that his father asked the victim for a "sup" of beer but that the victim refused. He said Raines and the victim began arguing about beer. He said that the victim said something about Raines's mother and that Raines said he did not care. He said that his father tried to get him and his brother to back away when they started arguing and that he and his brother went to an adjacent shed and were not paying close attention to what was happening. He said that his father told the victim and Raines to stop talking about each other's mothers and that the victim then made a comment to his father about his father's mother. He said that the victim held a small pocketknife behind his back the entire time and that the victim and Raines laid their knives on the table to see

whose was the biggest. He said that he believed that the victim had one knife and that Raines had two, a big one and a small one. He said the argument seemed to subside after Mr. Edwards took away the victim's knife and Raines's small knife.

Young Mr. Kennimer testified that during the argument between the victim and Raines, Durham stood by the table with his hand in the pocket of his Army-style pants and tried to convince the others to stop arguing. He said he and his brother returned to the area where the others were to get a drink of water. He said that his father asked Durham if he wanted to go to the store and that Durham declined and said, "[Y]a'll better leave." He said that the victim was about to go to the store and that when the victim turned, Durham pulled a big knife from his pocket and stabbed the victim in the back twice. He said his father tried to get him and his brother out of the way. He said Durham and the victim fell on the ground. He said the victim got up and started walking when Raines grabbed the victim and stabbed him in the leg. He said that Mr. Edwards pushed Raines off the victim. He said the victim got up and walked toward a house. He said the defendants took off their shirts and ran away from the victim toward a bridge. On cross-examination, he agreed that the state gave his father a tape of his father's prior testimony, to which he listened at home, and that listening to this tape helped him remember things.

Yewanna Mae Green testified that she saw the defendants, Durham and Raines, whom she knew as Yogi, and the victim at the 23rd Street flea market on April 1, 2000. She said that she was kneeling in the back of the flea market, looking through a pile of clothes, when she heard a "big ruckus," involving cursing and arguing. She said she looked up to see the defendants and the victim coming behind the back side of the building. She said each time the victim would stand to run, Durham and Yogi would knock him down and kick him. She said that Durham also poked the victim with his hand. She said that Durham pushed the victim down the first time and that Yogi pushed him down the second time. She said that after they knocked the victim down the fourth time, they let him walk away. She said that the victim's nose was bleeding and that he had blood all over the front of his shirt. She said as the victim went past her, she asked if he was all right, and he said no. She said that the victim staggered over beside a house and that the defendants ran across the bridge in the opposite direction from the victim. She said that she and Ray Kennimer walked around the house and found the victim lying face down. She said she made two telephone calls to 9-1-1.

On cross-examination, Ms. Green agreed that she had consumed beer with the victim at the flea market and had used crack cocaine, but she said she did not drink beer or use cocaine on April 1, 2000. She agreed that the first time she called 9-1-1, she told the operator that she did not know who had attacked the victim. She agreed that she called 9-1-1 a second time and said that she had found out who attacked the victim. She admitted that she knew the identity of the perpetrators from the start but said she did not want to get herself into trouble. She said that someone had told her not to involve herself in the situation. She said that she felt good about coming to court and would have come voluntarily if she had not been subpoenaed.

Officer Christopher McCloud of the Chattanooga Police Department testified that at 4:20 p.m. on the day of the offense, he received a call about a stabbing in the 2000 block of South Lyrley

Street and a description of a white male wearing black. As he drove south on Lyrley, he saw Raines walking north in the 1600 block. He stopped Raines because Raines was wearing black pants and a black hat and had a black shirt draped over his shoulder. He frisked Raines and found one eight-inch lock-blade knife and one four-and-three-quarter-inch pocket knife in his pants pocket. Raines was sweating profusely and had blood smeared on the inside of his right forearm. On cross-examination, he admitted that he did not collect a sample of the blood from Raines's arm or test the knives for blood.

Retired Sergeant Ralph Brown, who worked for the Chattanooga Police Department at the time of the offense, testified that he assisted Officer McCloud in arresting Raines. He said Raines had a small amount of blood on his right forearm and on the back of his arms. Upon arriving at the scene with Raines in the police car, he saw the victim, whose breathing was labored, being loaded into an ambulance. At the scene, he developed information on a second suspect, who was reportedly at the 1600 or 1700 block of South Lyrley Street. He walked to that area and saw Durham's head protruding from a tarp near a construction site. He said that Durham's shirt was lying on the ground underneath him. He said the shirt had blood or dirt on it. On cross-examination, he read a portion of his testimony at the preliminary hearing in which he said that Durham was wearing a white shirt with blood on it.

Officer Darryl Whitfield, a certified crime scene technician with the Chattanooga Police Department, testified that he collected evidence from a crime scene near the flea market on April 1, 2000. Although the victim was no longer at the scene when he arrived, he found a bloodstained, yellow shirt near the brown house by which the victim was found. This area was 539 feet from a table on the edge of a shelter at the flea market. On the table, Officer Whitfield found a King Cobra malt liquor bottle. He found a red lighter in a grassy area one hundred feet from the beer bottle and between the beer bottle and the house. From the area near the red lighter, he collected a watch, an unused cigarette, and a hook-bladed knife. The knife was five inches long and had a steel blade and handle. Additionally, he found two bloodstains on the ground near where the victim fell. On cross-examination, Officer Whitfield testified that he did not recall if those two bloodstains were the only ones in the area. He agreed that he did not know to whom the cigarette, the lighter, and the watch belonged. He said he found no other knives at the scene, and he admitted that he conducted no blood, fingerprint, or DNA tests on the evidence.

Dr. Frank King, the Hamilton County Medical Examiner, testified that he performed an autopsy on the victim, who had died from multiple stab wounds. The victim had four stab wounds that appeared to have been inflicted close in time by a single-edged, knife-like weapon. One wound on the victim's back just behind the left arm was 2.9 inches deep and extended from the entry point in an upward direction through muscle and fat. The second wound was in the left mid-back area, was three inches deep, and extended upward and to the right. This wound extended into the victim's chest between his ribs and through his left lung. The weapon had punctured the victim's thoracic aorta. This wound caused a large internal hemorrhage and was fatal. The victim had a third stab wound in his right lower back that was 2.8 inches deep and extended down and to the right into muscle and fat. The fourth stab wound was in the back of the victim's left thigh just below the

buttock. This wound was two inches deep and extended upward and to the right into muscle and fat. Dr. King said that aside from the wound that entered the chest cavity, the other three wounds would not have been fatal to a person who received medical care. He said that a person with a wound like the one that entered the victim's chest cavity could continue to move or even run until the person lost consciousness from depleted oxygen levels to the brain due to blood loss. He said this would happen in a matter of minutes.

Dr. King testified that the wounds could have been caused by the same knife or different, yet similar, knives. He said that the knife may not have had blood on it following the stabbing because the blood could have been wiped from the knife as it was pulled through the muscle and fat or the victim's clothing. He said if the knife surface was hard steel, then blood would be less likely to stick to it.

Dr. King testified that the victim also had a bruise on his lower back and a bruise on the back of his left arm. He agreed the bruises could have been caused by kicking. He said the location of the bruises was not typical for falling down or against something. He said the victim had a blood alcohol content of .22 percent and a negative drug screen. On cross-examination, he estimated that the victim would have had to have consumed eight or nine twelve-ounce beers to reach that blood alcohol concentration. He said the victim's hands and arms were not injured and agreed the victim's bruises were consistent with being in a fight. He said that the location of the stab wounds did not reveal the position of the person inflicting those wounds. He agreed that the wounds could have been inflicted by someone standing in front of the victim, reaching around behind him, and stabbing his back. He agreed that the knife found at the crime scene was capable of killing someone.

Detective Charles Dudley of the Chattanooga Police Department testified that he saw the defendants on the evening of April 1, 2000. He said the defendants had scratches on their bodies. Photographs of Durham taken that evening showed an abrasion on Durham's right shoulder and scratches and abrasions on Durham's back from the upper chest area to his waistline. Detective Dudley said Durham's scratches did not appear to have been caused by a knife. He agreed that they were consistent with running through the woods without a shirt or lying on rocky ground and that there was a wooded area near the scene of the stabbing. He said Durham was wearing work boots and had no knife wounds, open cuts, or bruises on his face. On cross-examination, he said that nothing on Rick Edwards' body caused him to believe that Mr. Edwards had been involved in a fight. He admitted that Mr. Edwards had been wearing a shirt.

Defendant Gary Lee Raines testified that he came to Chattanooga on April 1, 2000, to visit his children, who live with his ex-sister-in-law, and Durham, who lived five blocks from the flea market. He said he and Durham were good friends and as close as brothers. He said that while returning from his sister-in-law's home, he and Durham took a shortcut through the flea market. He said that a man named Ray called to Durham and asked for some beer. He said that while they were talking with Ray, the victim and Rick Edwards approached and that the victim tried to sell him one of the victim's two "hawk-billed" knives. He said he told the victim that he could not afford the knife but that he might be able to sell it for him. He said that he told the victim he wanted too much

for the knife and that the victim "got smart" with him. He said that he and the victim began arguing about knives and then began arguing about their mothers. He said afterward, they "chilled out" and drank beer.

Raines testified that he and Mr. Edwards began arguing and then engaged in a "push-and-shove" fight over beer. He said that Mr. Edwards wanted some beer and that he was not going to give him any. He said that out of the corner of his eye, he saw the victim walk around the table. He said that then Mr. Edwards hit him in the chin and that he and Mr. Edwards began struggling. He said he did not see what was happening behind him but heard someone speak. He said that when he turned back around, Mr. Edwards and the victim were running toward Lyrley Street. He denied stabbing or kicking the victim. He said that although the victim had an open knife while they were talking, he did not recall the victim threatening him with it.

Raines testified that he and Durham ran across the bridge and through the woods. He said he ran because he thought that the victim and Mr. Edwards would return with their friends from Lyrley Street and that he and Durham would get "ganged." He said he realized the victim had been stabbed after he had fled but before he crossed the bridge near the flea market. He said he was arrested as he walked up Lyrley Street after leaving the flea market. He said the blood on his arm could have come from being scratched when he ran through the woods or from his fight with Mr. Edwards.

On cross-examination, Raines denied sharing beer with the victim, explaining that he and Durham had bought beer at the store and were carrying it as they walked through the flea market. He said that they were all "pretty drunk" but that he was not so drunk that he could not remember what happened. He agreed that he and the victim were comparing knives and that they argued over the knives and the victim calling Raines's mother a name. He admitted that he told Detective Charles Dudley that he did not know why he and the victim were arguing. He said that he got into a fight with Mr. Edwards after Mr. Edwards said something smart to him about a beer. He admitted that he did not tell Detective Dudley that he and Mr. Edwards had fought over beer. He agreed that he told Detective Dudley that the victim and Mr. Edwards said they were going to whip him if he did not leave the parking lot. He said that although his statement reflected that he said he believed Durham had stabbed the victim, what he actually told Detective Dudley was that Durham could have stabbed the victim. Raines admitted that he told Detective Dudley that after telling Durham they had to go, he yelled to Mr. Edwards "I'll meet you some other day." He said he did not mean this as a threat but instead meant that he and Mr. Edwards could finish the fight another day or not. He said that after fleeing from the flea market, he and Durham split up when the police saw him. He said that he continued walking to draw the police away from Durham.

Based upon this evidence, the jury convicted both defendants of second degree murder.

# I. SUFFICIENCY OF THE EVIDENCE

The defendants contend that the evidence is insufficient to support their second degree murder convictions because the state failed to prove that they acted knowingly. Durham argues that the evidence shows that he was provoked and acting in self-defense. Raines argues that the proof fails to show he believed his stabbing the victim in the thigh was reasonably certain to cause the victim's death. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. <u>See</u> Tenn. Code Ann. §§ 39-13-201, -210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-302(b).

## A. Durham

Durham argues that the evidence shows that the victim provoked him. He asserts that he stabbed the victim after the victim had been arguing with a knife behind the victim's back and that he and the victim were involved in a "ruckus" in which they fell to the ground. He argues that this evidence along with the diminished credibility of the witnesses and the inconsistent testimony about the sequence of events creates a reasonable doubt.

Taking the evidence in the light most favorable to the state, Rick Edwards and DeWayne Kennimer testified that Durham stood by the table with his hand in his pants pocket as the victim and Raines argued. Notably, every witness who testified about the events preceding the offense, including Raines, said that the victim argued with Raines, not Durham. Raines testified that the argument between him and the victim subsided and that the company "chilled out" and drank beer. Young Mr. Kennimer also testified that the argument between the victim and Raines had subsided before the stabbing. Mr. Edwards said he told Durham of his intent to separate the victim and Raines and encouraged the victim to leave. Mr. Edwards said that as the victim walked past Durham, Durham pulled a knife from his pocket, stabbed the victim in the back three times, and said, "Yeah Motherf*****r." Young Mr. Kennimer testified that Durham declined his father's invitation to go to the store and warned his father that they should leave before stabbing the victim twice in the back as the victim turned to go to the store. This evidence–particularly Durham's warning to the Kennimers, the location of the wound, and his statement following the stabbing–is circumstantial

-7-

proof that Durham knowingly killed the victim. The jury chose to reject both the defendant's claim that he acted in self-defense and the notion of adequate provocation. The evidence supports the jury's finding beyond a reasonable doubt that Durham committed second degree murder.

## B. Raines

Raines contends that the state failed to prove that he knowingly participated in the killing because no evidence shows that he believed his conduct was reasonably certain to cause the victim's death. He argues that some evidence shows that he was engaged in a separate fight with another person at the time Durham stabbed the victim. He asserts that he likely was not aware of the previous stabbing and the severity of the victim's injuries at the time he stabbed the victim in the thigh. He concludes that the evidence proves that he merely committed an assault rather than a knowing killing because it does not show that he believed his stabbing of the victim was reasonably certain to cause the victim's death. He adds that the diminished credibility of the witnesses as well as their inability to agree on the location of the participants in the fight or the sequence of events creates a reasonable doubt about whether he acted knowingly.

At trial, the state proceeded upon a theory of criminal responsibility with regard to Raines's participation in the offense. One is criminally responsible for a crime committed by another if by acting "with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). Common law principles governing aiders and abettors are embraced by the statutory provisions for criminal responsibility. Tenn. Code Ann. § 39-11-402(2), Sentencing Commission Comments; State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997). To be criminally responsible for the acts of another, a defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). In other words, the defendant must "'knowingly, voluntarily and with common intent unite with the principal . . . in the commission of the crime.'" Maxey, 898 S.W.2d at 757 (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). The requisite criminal intent may be inferred from the defendant's "presence, companionship, and conduct before and after the offense." State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982).

Taking the evidence in the present case in the light most favorable to the state, the proof supports the jury's finding that Raines aided Durham in killing the victim. Rick Edwards denied fighting with Raines, and Detective Dudley said that he noticed no evidence on Mr. Edwards' person that he had been involved in a fight that day. According to Mr. Edwards and DeWayne Kennimer, Raines chased the victim, who was attempting to flee the area after being stabbed by Durham, and stabbed him in the thigh. Mr. Edwards said that Raines kicked the victim before stabbing him in the leg. Yewanna Mae Green testified that the defendants pushed the victim to the ground a total of four times as the victim attempted to leave the flea market. She said Durham pushed the victim down the first time and Raines the second time. Ms. Green, Mr. Edwards, and young Mr. Kennimer all

testified that Raines kicked the victim while the victim was on the ground. This evidence reveals that Raines knowingly and voluntarily united with Durham in attacking the victim.

Furthermore, we believe that the jury could have rationally concluded that Raines knew that the victim was seriously injured at the time that he stabbed the victim. Mr. Edwards and DeWayne Kennimer testified that Raines was standing with Durham and the victim just before Durham stabbed the victim. From this evidence, the jury could have reasonably inferred that Raines saw Durham stab the victim. Ms. Green said that the victim's shirt was bloody. Additionally, the jury could have found that Raines saw the victim's stab wounds when he chased the victim and stabbed him in the back of the leg. This evidence supports the jury's finding that Raines shared a common intent with Durham to kill the victim. Finally, Raines's actions following the stabbing show that he was aiding Durham. Raines testified on cross-examination that he told Durham they had to go before they fled from the scene. He said that he attempted to divert the police away from Durham as he was walking on Lyrley Street. The evidence is sufficient to support Raines's second degree murder conviction.

## II. PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

The defendants contend that the state committed prosecutorial misconduct by implying during closing arguments that if the jury did not convict them, they would harm the witnesses. They argue that this statement was unsupported by the evidence and prejudicial because the trial court gave no curative instruction. They also argue that they were prejudiced by the timing of this error, which occurred during the state's rebuttal closing argument, because it prevented them from challenging all the accusations against them and presenting all available defenses. Noting the inconsistency of the state's witnesses and the lack of any dispositive forensic proof, they assert that the error is not harmless because the evidence of their guilt was not overwhelming. The state challenges the defendants' interpretation of the argument in question and contends that any error was harmless because the evidence of the defendants' guilt was overwhelming. Although we conclude that the argument was improper, we hold that the error was harmless.

During rebuttal closing argument, the prosecutor argued in pertinent part:

> Ladies and gentlemen, this is not–and I don't have to tell you this, but it's not the Old West, this is not Dodge City. This is Chattanooga, Tennessee. This is not a place where we have fights in the street and we take our shirts off and we run after we kill someone and we hide under tarps and we try to divert attention from our buddies so that we're not picked up and so that we're not arrested and so that we're not held accountable by a jury in a court of law.
>
> That's why we're here. It's Chattanooga. It's Chattanooga where Ricky, DeWayne, Yewanna, Ray-Ray and his other boy, all lived. It's a flea market where they frequented.

I remind you that it was no easy task for Yewanna or for DeWayne or for any of the others to come into this courtroom and take this witness stand and take an oath to tell you the truth, and face these two individuals sitting directly in front of them. Two individuals whose last acts some of them saw, or to say, "Yeah," after he had stabbed another individual in the back three times, and the other individual to look and say, "I'll see you on another day." That was not an easy thing to do.

If either one of these men have a chance to see any one of these people who testified against them on another day–

[Defense Counsel]: Objection. Objection.

[Prosecutor]: It will be because you allow it.

THE COURT: Sustain.

The prosecutor then concluded his argument by asking the jury to convict Durham of second degree murder and to convict Raines of facilitation of second degree murder if it did not think his conduct rose to the level of second degree murder.

The Tennessee Supreme Court has recognized that the "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). Prosecutorial misconduct does not constitute reversible error unless it affected the outcome of the trial to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). Jury argument must be predicated on evidence that is introduced during the trial and is pertinent to the issues being tried. Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Although attorneys may not argue facts which are not of record, a prosecutor may properly base his or her argument upon inferences supported by evidence in the record. See State v. Brown, 836 S.W.2d 530, 552 (Tenn. 1992); State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976).

In the present case, the defendants contend that the prosecutor's statement implied that if the jury did not convict them, they would kill the witnesses. They argue that this implication is unsupported by the evidence, asserting that Raines's statement, "I'll meet you some other day," was directed toward a single individual, Rick Edwards. They also argue that the statement followed a fight between Raines and Mr. Edwards and specifically referred to concluding that particular fight. They argue that the record is devoid of evidence that, even if Raines were not intoxicated, he could have contemplated the systemic intimidation of key prosecution witnesses to which the state alludes.

-10-

We agree with the defendants that the record does not support the inference that the defendants sought to intimidate the state's witnesses or would harm them if not convicted. Raines admitted on cross-examination that he yelled "I'll meet you some other day" to Rick Edwards just before he and Durham fled the scene. Raines insisted that this statement was not a threat but merely an invitation to Mr. Edwards to finish their fight at a later time:

> [State]: You didn't mean it as a threat when you told Ricky, "I'll meet you some other day"?
>
> [Raines]: No, I didn't.
>
> [State]: Then how did you mean it?
>
> [Raines]: I meant it that I'd meet you some other day. That's the way I meant it.
>
> [State]: To do what?
>
> [Raines]: Well, if he wanted to fight, to finish the fight, we could; if not, all right then.
>
> [State]: You would be agreeable to continuing this altercation on some later date?
>
> [Raines]: Yeah.
>
> [State]: Upon a chance meeting?
>
> [Raines]: If that's what he wanted to do.
>
> [State]: That would be fine with you?
>
> [Raines]: Yeah.
>
> [State]: Would you have looked forward to it?
>
> [Defense Counsel]: Your Honor, I think the question has been asked and answered.
>
> [Raines]: No, I wasn't going to go looking for it.
>
> THE COURT: Sustain. Sustain the objection.

Despite Raines's benign characterization of the statement, the jury could have readily inferred that Raines was threatening Mr. Edwards. Furthermore, we note that Mr. Edwards agreed during his testimony that he was nervous to be in court. On the other hand, nothing about the statement suggests that Raines was trying to deter Mr. Edwards from reporting the incident or being a witness in this case.

We also note that Yewanna Green testified that she gave the 9-1-1 operator false information regarding her knowledge of the identity of the perpetrators because, according to her, "I didn't want to get myself in trouble." She testified that she was scared and had been advised by an unnamed person not to get involved in the situation, which she said included appearing in court. Although this evidence suggests that she was afraid of getting involved, the record does not reveal that this fear was attributable to the defendants' attempting to intimidate her. Furthermore, Ms. Green testified that she felt "pretty good" about testifying at trial and would have come to court voluntarily if she had not been subpoenaed. This evidence contradicts the state's argument that the witnesses faced and testified against the defendants only with great difficulty with the implication being they were afraid of the defendants. We conclude that the prosecutor's argument implying that the state's witnesses would be in danger if the defendants were not convicted is error. See, e.g., State v. Williams, 690 S.W.2d 517, 525 (Tenn. Crim. App. 1985) (holding that the state's argument that state's witnesses' houses were burned as a form of intimidation was improper in the absence of any evidence of the reasons that the houses burned). Thus, the trial court properly sustained the defendants' objection.

We turn to the question of whether the error harmed the defendants by affecting the outcome of the trial to their prejudice. See Bane, 57 S.W.3d at 425. In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the state's conduct could have improperly prejudiced the defendant and affected the verdict:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

See also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

In assessing the improper argument in the context of the facts and circumstances of the case, we consider whether it was "lengthy or repeated, or whether the statement was single or isolated." Judge, 539 S.W.2d at 343. We may also consider whether the prosecutor made the statement in response to the defendants' arguments. See id. In the present case, the improper argument was a brief statement near the conclusion of a two-day trial. This was not a point that the prosecution repeated or emphasized. Furthermore, we believe the argument was made in response to the defendants' attacks in their closing arguments upon the credibility of the state's eyewitnesses. In essence, the state was arguing that the eyewitnesses did not stand to benefit from testifying against the defendants. Nothing in the record suggests that the prosecutor made the statement in bad faith.

Also regarding the circumstances of the improper statement, the defendants contend that the timing of the improper argument deprived them of an opportunity to respond to it. We agree that because the improper argument occurred during the state's rebuttal closing argument, the defendants had no opportunity to argue to the jury that the prosecutor was taking Raines's statement to Mr. Edwards out of context. On the other hand, the trial court sustained the defendants' objection to the improper argument thereby lessening the prejudice stemming from the timing of the statement.

The defendants argue that they were prejudiced by the trial court's failure to give a contemporaneous curative instruction. During its charge to the jury on the day following the closing arguments, the trial court instructed that the arguments of counsel were not evidence and that the jury should "only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge." The defendants did not request that the trial court give a contemporaneous curative instruction. We believe the defendants should have taken steps to cure any prejudice from the lack of a contemporaneous objection. See State v. Pulliam, 950 S.W.2d 360, 369 n.3 (Tenn. Crim. App. 1996) (noting in the context of improper closing argument that if "a trial judge does not give a curative instruction *sua sponte*, the objecting party must request such an instruction in order to avoid waiving the issue for the purpose of appellate review"). Thus, we give little weight to the fact that the trial court did not contemporaneously attempt to cure the error.

Finally, the evidence against the defendants was strong. Two eyewitnesses testified that the defendants stabbed the victim in the back and the back of his thigh while the victim was attempting to flee. Ms. Green also testified that the defendants attacked the victim as he was running away. Having determined that the defendants' other issues are without merit, we also do not believe the improper argument cumulatively affected any other errors in the record. The defendants contend that the jury was swayed to convict them in order to save the lives of the state's witnesses. We agree that the state "may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury," rather than counseling "jurors to base their decision upon a reasoned moral response to the evidence." State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998). Nevertheless, even in the absence of a contemporaneous curative instruction, we hold that the improper argument was harmless in light of its brevity and the weight of the evidence against the defendants.

## III. VOLUNTARY INTOXICATION INSTRUCTION

Raines argues that the trial court committed plain error in failing to instruct the jury on voluntary intoxication because the jury was considering a specific intent crime of facilitation of second degree murder. He argues that his testimony provided sufficient evidence of voluntary intoxication to require that the trial court so instruct the jury. The state argues that the record is devoid of evidence that the defendant was deprived of the mental capacity to commit the offense. We hold that the trial court did not commit plain error.

The record reflects that neither defendant requested an instruction on voluntary intoxication. See Tenn. R. Crim. P. 30(a) (providing that the parties may file written requests that the trial court give certain instructions). Instead, during a jury-out hearing on the proposed jury charge, the state asked the trial court whether it planned to instruct on voluntary intoxication, noting that it had not foreseen that issue before the defendant's testimony. The court stated:

> Well, the only evidence, of course there is evidence of drinking of everybody, but there is no evidence that any party was so intoxicated that, as far as this court observed, that it would affect their thinking. Mr. Raines was asked directly and he said that they were drunk. So there's no evidence that any party there was impaired by the amount of alcohol that had been consumed. So I'm not going to charge voluntary intoxication.

The defendants did not raise the issue in their motions for a new trial. Raines's failure to raise the issue in his motion for a new trial precludes our review of this issue, subject to our noticing plain error. See T.R.A.P. 3(e) (providing that the refusal of jury instructions not raised in a motion for new trial will be treated as waived on appeal), 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error).

Pursuant to Rule 52(b), Tenn. R. Crim. P., we have the discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice. The following factors should be considered in determining the existence of plain error:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is 'necessary to do substantial justice.'"

-14-

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App.1994)). As noted in Adkisson, "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." 899 S.W.2d at 642.

After careful review of the record in the present case, we cannot say that plain error is evident with regard to the lack of an instruction on voluntary intoxication. Although voluntary intoxication is not a defense, voluntary intoxication "is admissible in evidence if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). In the present case, Raines's only direct testimony on the issue of his intoxication was that he and the others "had had quite a bit to drink that day." On cross-examination, Raines testified that he did not know the victim's blood alcohol content was .22 percent but that they were "all pretty drunk." Upon additional questioning, he agreed with the prosecutor that he had been drinking but was not so drunk that he could not remember what had happened.

In this respect, assuming that the trial court should have instructed the jury on voluntary intoxication, the failure to do so was harmless because the defendant did not rely upon his intoxication in presenting his defense. Defense counsel did not delve into the matter of the defendant's intoxication on direct examination or seek to establish the extent of the defendant's intoxication after it had been raised in cross-examination. Instead, Raines denied stabbing or having any physical altercation with the victim and sought to prove that he did not know what was going on between the victim and Durham while he was fighting with Mr. Edwards. The thrust of Raines's closing argument was that the lack of physical evidence linking him to the offense and the impeachment of the state's witnesses created reasonable doubt. He mentioned the fact that he had been drinking only to say that it was consistent with the vagueness of his explanation of the offense. The defendant's substantial rights were not affected by the omission of this instruction. We discern no plain error.

Based on the foregoing and the record as a whole, we affirm the trial court's judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE

-15-